**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **VERITEXT CORP.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-13903 C/W**<br>**17-9877**<br>**REFERS TO: 17-9877** |
| **PAUL A. BONIN, ET AL.** | **SECTION: "B"(2)** |

**ORDER**

Before the Court are, plaintiff Esquire Deposition Solutions' "Plaintiff Esquire Deposition Solutions' Motion for Reconsideration or, Alternatively, to Amend or Alter Judgment" (Rec. Doc. 145); defendant Louisiana Court Reporters Association's ("LCRA") "Defendant Louisiana Court Reporters Association's Memorandum in Opposition to Plaintiff Esquire Deposition Solutions' Motion for Reconsideration or, Alternatively, To Amend or Alter Judgment" (Rec. Doc. 151); and defendant CSR Board's "Memorandum in Opposition to Esquire Deposition Solutions, LLC's Motion for Reconsideration or, Alternatively, to Amend or Alter Judgment" (Rec. Doc. 155).

For below assigned reasons,

**IT IS ORDERED** that plaintiff Esquire's motion for reconsideration or amendment is **DENIED**.

Based on extensive filings in this matter, the factual basis here incorporates the factual findings from the prior dismissal order at issue. See Rec. Doc. 137 at 2-4. That order involved Esquire's Sherman Act and constitutional law vagueness claims against

1

defendant LCRA, and Esquire's constitutional law vagueness claims against defendant Louisiana Board of Examiners of Certified Shorthand Court Reporters ("CSR Board").

Esquire contends the allegations in their complaint (Rec. Doc. 1) established that the LCRA sanctioned and promoted a price fixing conspiracy "separate and apart from its lobbying of the [CSR Board]." *Id*. at 1. Esquire further contends that regardless of whether the allegations were sufficient standing alone, defendant LCRA produced meeting minutes on September 30, 2019 from defendant LCRA's annual board and executive meeting, which purportedly reveal: (1) LCRA "adopted a policy against contracting"; (2) "solicited insurance companies and law firms to boycott national court reporting firms"; and (3) "contacted a national association of court reporters in 2018 to solicit its support against the LCRA's contracting stance and was told that such conduct is unlawful." (Exhibit 3 to Rec. Doc. 145)

Esquire asserts that this court failed to take into consideration "detail (sic) factual allegations" concerning whether LCRA member's actions were undertaken in an individual capacity or on behalf of the association. It refers to allegations in paragraphs 19 and 20 of their complaint, which identify "key figures (Messrs. Borello and Gilberti) who are senior officers and directors of the LCRA." *Id*. Plaintiff also contends that evidence recently produced by LCRA confirms that individuals within LCRA were not acting in their individual capacities but on behalf of the association.

Esquire further argues that meeting minutes from LCRA's Executive Board meeting in 2018 revealed that the President of LCRA called her counterpart at the National Court Reporters Association ("NCRA") "'to discuss NCRA's stance on anti-contracting.'" (quoting Exhibit 4, p. 3, Rec. Doc. 145). In further support of this contention, it further states that the NCRA president stated that "Legal Counsel can't link ethics to stop companies from engaging in business practices." *Id*.

Defendant LCRA and the CSR Board oppose plaintiff's motion for reconsideration. (Rec. Docs. 151 & 155).[1] Defendants point out that the court's prior findings should not be disturbed because: (1) the court "expressly acknowledged that certain LCRA members served in senior capacities at the LCRA"; and (2) "the purported 'newly discovered evidence' advanced by Esquire does not change the outcome of the case and is merely cumulative in nature." Rec. Doc. 151 at 1.

Defendants contend that Esquire is unable to make the requisite showing to alter its judgment under FRCP 59(e). First, defendants argue that the subject ruling contains no manifest error of fact or law, as the court took into consideration the positions held by certain members of LCRA. *Id*. at 3. Defendants also aver that the caselaw cited by plaintiff to support their contention that an association or organization can be held liable for the actions of

---

[1] Defendant CSR Board adopts defendant LCRA's arguments made in Rec. Doc. 151 as their own. *See* Rec. Doc. 155 at 1-2.

its members is misplaced. *Id*. at 4. Specifically, defendants note that the cases cited are those in which an organization or association unilaterally enacted anticompetitive legislation, and in this case defendant LCRA shows it did not engage in any such unilateral action. *Id*.

Esquire's assertion that defendants failed to produce a memorandum from their records is incorrect. Defendants show that in their "Supplemental Discovery Responses dated October 16, 2019" defendant LCRA produced the memorandum in a PDF file format.

Specifically, defendants state that in the 2013 LCRA annual meeting minutes, a member of the LCRA (Mr. Borello) "suggested that the LCRA take the position that it "has been against contracting and will remain against it." (citing Rec. Doc. 145-3 at 2). Absent from the minutes is (1) any indication that a motion was made; (2) a vote taken; or (3) any action taken, regarding defendant LCRA's stance on contracting. Further, defendant notes that the law firm letters that were then sent out contained: (1) Louisiana Code of Civil Procedure Article 1434; (2) the statute's historical background; and (3) the CSR Board's interpretation of said statute, and "hardly constitute 'private enforcement efforts'." The letters merely informed local law firms of the existence of the code article in question.

I. **LAW AND ANALYSIS**

Federal Rule of Civil Procedure 54(b) provides the district court with "the inherent procedural power to reconsider, rescind, or

modify an interlocutory order for cause seen by it to be sufficient." *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *3 (E.D. La. Apr. 5, 2010) (citing *Melancon v. Texaco, Inc.*, 659 F. 2d 551, 553 (5th Cir. 1981). The district court's discretion is broad when determining whether a motion for reconsideration has merit; however, "it is exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays." *Id*. (citing 18b Charles A. Wright et al., Fed. Prac. & Proc. § 4478.1 (2d ed.). "The general practice of courts in the Eastern District of Louisiana has been to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment." *Hoffman v. Bailey*, No. 13-5153, 2015 WL 9315785, at *7 (E.D. La. Dec. 23, 2015).

A Rule 59(e) motion calls into question the correctness of a judgment. *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002). Rule 59(e) serves "the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Basinkeeper v. Bostick*, 663 F. App'x 291, 294 (5th Cir. 2016) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)). Amending a judgment is appropriate under Rule 59(e): "(1) where there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of

5

law or fact." *Berezowsky v. Rendon Ojeda*, 652 F. App'x 249, 251 (5th Cir. 2016) (quoting *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012)). Because Rule 59(e) has a "narrow purpose," the Fifth Circuit has "observed that [r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* (quoting *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)). Thus, "a motion for reconsideration is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* (quoting *Templet*, 367 F.3d at 479). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." *Ferraro v. Liberty Mut. Ins. Co.*, Case No. 13-4992, 2014 U.S. Dist. LEXIS 148294 at *2-3 (E.D. La. Oct. 17, 2014).

Reconsideration of the prior dismissal order is not proper. Plaintiff Esquire contends the order erred by not taking into consideration factual allegations which plaintiff purports distinguish their case from one that seeks to hold an association liable for member conduct that takes place independently of the association. *See* Rec. Doc. 145-1. In support of this contention, plaintiff reiterates that the particular members complained of are "not ordinary association members" but rather "members of the board of directors and senior officers." Rec. Doc. 145-1 at 4. However,

6

the ruling at issue did take note of roles that individual members played within their association. For instance, the ruling observed that Peter Gilberti was a "member of the LCRA Board and the association's current Treasurer and Registered Agent." Rec. Doc. 137 at 10.

Esquire further contends that the "key figures" were active market participants and that they engaged in anticompetitive conduct separate and apart from their lobbying of the CSR Board. Rec. Doc. 145-1 at 5. Plaintiff also contends that the ruling ignored "a public admission of price fixing by Peter Gilberti, a spokesperson, officer, director, and registered agent for LCRA."[2] *Id*. (Citing Rec. Doc. 1 at ¶ 52). However, after reviewing plaintiffs' cited materials, it is evident that Mr. Gilberti did not make that statement at the CSR Board meeting.

Esquire also cites us to paragraph 52 of its complaint, which in turn cites to "Ex. 1 at 201:19-202:2." *See* Rec. Docs. 145-1 at 5; 1 at ¶ 52. "Ex. 1" is a transcript of a CSR Board meeting that took place on January 20, 2012. *See* Rec. Doc. 1-1. The statement plaintiffs attribute to Mr. Gilberti is actually located in the transcript of a separate CSR Board Meeting, which took place on April 29, 2013. *See* Rec. Doc. 1-3, Exhibit 3 to Complaint, 201:19-202:2.

---

[2] Esquire quotes Peter Gilberti as stating: "our reporters [referring to LCRA] are upset that we had to give up a lot of this work, and they're not engaging in contracting anymore, but we know that a lot of reporters are, so who is policing this."

7

In the CSR Board's April 29, 2013 meeting, Mr. Gilberti did not use the quoted language that plaintiffs attributed to him in plaintiffs' Motion for Reconsideration (Rec. Doc. 145-1). In fact, the quoted statement was given by a "Ms. Landrieu". Rec. Doc. 1-5 at 201:2. It is not alleged in the complaint whether "Ms. Landrieu" is: (1) a member of the LCRA; (2) a past or current director or officer of the LCRA; or (3) affiliated with in any way with the LCRA. *See* Rec. Doc. 1. In fact, the complaint does not mention a Ms. Landrieu. *Id*. Therefore, the incorrect attribution here to "Peter Gilberti", is devoid of meaning or impact on the subject ruling. The record has no reference on who "Ms. Landrieu" is or in what capacity she allegedly spoke. In sum, the prior ruling did not disregard the noted factual allegations pertaining to LCRA's conduct, as incorrectly alleged by Esquire.

Esquire further alleges that "evidence only recently produced" by defendant LCRA confirms that the LCRA adopted a policy against contracting, engaged in "private enforcement activities" to discourage insurance companies and law firms from engaging with national court reporting firms, and that the LCRA previously contacted the NCRA to solicit its support against contracting. Rec. Doc. 145-1 (citing Rec. Doc. 145-1, Exhibits 1-4). Esquire argues *Noerr-Pennington* immunity is not applicable because newly produced LCRA meeting minutes establish that LCRA had established its own

anti-contracting policy, separate and apart from LCRA's lobbying efforts to the CSR Board. *Id*. at 6.

In *National Society of Professional Engineers v. United States* ("*NSPE*"), 435 U.S. 679 (1978), the United States brought a civil action against the National Society of Professional Engineers' ("The Society") to "nullify" the Society's Code of Ethics, which prohibited competitive bidding by its members. *NSPE*, 421 U.S. at 681. The issue in the *NSPE* was "whether the [ethical] canon [was] justified under the Sherman Act . . ., because it was adopted by members of a learned profession for the purpose of minimizing the risk that competition would produce inferior engineering work endangering the public safety." *Id*. The Supreme Court affirmed the Appellate Court's judgment that held the Society was "prohibit[ed] . . . from adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical." *NSPE*, 421 U.S. at 696-97.

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the issue was "whether a minimum-fee schedule for lawyers published by the Fairfax County Bar Association and enforced by the Virginia State Bar violate[d] § 1 of the Sherman Act . . . " *Goldfarb*, 421 U.S. at 775. The United States Supreme Court held that neither the County nor the State Bar were exempt from the requirements imposed by the Sherman Act. *Id*. at 791-792. The Court noted that while the State Bar did not officially take any formal disciplinary action against

9

those who violated the restrictive fee schedule, or create said schedule, it "published reports condoning fee schedules, and . . . issued two ethical opinions indicating that fee schedules cannot be ignored." *Id*. at 776-777.

In *Silver v. N.Y. Stock Exchange*, 373 U.S. 341 (1963), the United States Supreme Court held that a rule adopted by the New York Stock Exchange was violative of the Sherman Antitrust Act. *Silver*, 373 U.S. at 364 ("Our decision today recognizes that the action there taken by the Exchange would clearly be in violation of the Sherman Act . . .").

While Esquire correctly shows that the associations in the above cited cases were liable for the actions of their members, it fails to recognize a key difference in the issue at present: LCRA did not create the complained of statute that resulted in the alleged restriction on trade or competition, the Louisiana Legislature enacted Louisiana Code of Civil Procedure Article 1434.

In *NSPE*, *Goldfarb*, and *Silver* the associations that were held liable enacted a code of ethics, a fee schedule, and a rule, respectively. *See NSPE*, 421 U.S. at 697 (Association's Ethical cannon "was *adopted by members of learned profession* for the purpose of minimizing the risk that competition would produce inferior engineering work endangering public safety.")(emphasis added); *see also Goldfarb*, 421 U.S. at 775 ("We granted certiorari to decide whether a minimum fee schedule for lawyers *published by the Fairfax*

10

*County Bar Association* and enforced by the Virginia State Bar violates [the Sherman Act].")(emphasis added); *see also Silver*, 373 U.S. at 364 ("Our decision today recognizes that the action there *taken by the Exchange* would clearly be in violation of the Sherman Act . . .")(emphasis added)[3]. Unlike the associations in the above cited cases, the LCRA did not unilaterally enact allegedly anticompetitive Article 1434, and it is vague as to whether any action to adopt the anticompetitive stance of Article 1434 was taken.

Defendant LCRA did issue a memorandum to law firms, stating that defendant CSR Board had advised defendant LCRA that "if [LCRA Court Reporters] should do work for a 'national' firm, they might be in violation of La. C.C.P. Art. 1434, for violating the employee prohibition." Rec. Doc. 145-5 at 2. The Memorandum further states,

---

[3] Plaintiff further cites *N.C. Bd. Of Dental Examiners v. FTC*, 717 F.3d 359 (4th Cir. 2013) for the proposition that the LCRA's activities constituted prohibited conduct in restraint of competition. In *North Carolina Board of Dental Examiners*, the Board of Dental Examiners ("the Board"), which is a state agency, sent cease and desist letters to non-dentists who were offering teeth whitening services to customers. *Id*. at 365. These letters were sent pursuant to a North Carolina Statute that forbade non-licensed dentists from practicing dentistry in the state. *See id*. at 364-65. The cease and desist letters were issued to at least 27 non-dentists on official Board of Dental Examiners letterhead and requested that the targets of such letters "cease and desist 'all activity constituting the practice of dentistry.'" *Id*. at 365. The Board also, "'on several occasions, . . . discussed teeth whitening services provided by non-dentists and then *voted* to take action to restrict these services.'" *Id*. at 373 (quoting Final Order, 2011 WL 6229615, at *23)(emphasis added).
    The Fourth Circuit held that these actions, coupled with the Board's "'consistent practice of discouraging non-dentist teeth whitening services' through their cease and desist letters and other efforts," constituted prohibited conduct under the Sherman Act. *Id*. Notably, although there were discussions amongst members of the LCRA at meetings concerning anti-contracting, and a memorandum was issued, there is no evidence that a vote was taken to engage in concerted activities, and upon review, the memorandum does not rise to the level of a cease and desist letter expressly forbidding law firms from contracting with national court reporting firms.

"as a professional association, we are respectfully requesting your cooperation in these most important endeavors, by informing your insurance company clients that Louisiana Court Reporters are prohibited from engaging in such practices, as stated above, and will face disciplinary action resulting in the suspension and/or revocation of their license." Rec. Doc. 145-5 at 2-3. This memorandum does not rise to the level of either formally adopting a code of ethics or rule by the association, as in *NESP* and *Silver*, nor does it rise to the level of publishing ethical opinions and creating reports condoning the anti-competitive activity, as in *Goldfarb*. This undated memorandum, which was allegedly sent to law firms, merely quotes the Louisiana legislature's code article, states a brief history of said article, and gives LCRA's interpretation of the article.

Esquire's reliance on LCRA's meeting minutes is also misplaced. LCRA's minutes seem to show discussion of anti-contracting were present; however, discussions alone do not rise to the level of a formal adoption of an anti-contracting policy. In the Meeting Minutes dated January 28, 2013, it states "[Defendant] Vincent Borrello suggested that the LCRA take a position on the contracting issue; LCRA has been against contracting and will remain against it." Rec. Doc. 145-3 at 2. Once again, an individual member, albeit an immediate past president, made a suggestion about LCRA taking a stance on contracting. *See* Rec. Doc. 145-3 at 2. The minutes detail

no motion or vote by the members of the association board. *See id*. Further, the sentence immediately following states, "Discussion ensued regarding that issue and that in 2013 the CSR Board would start to enforce new rules against contracting." *Id*. This is not a formal adoption by the LCRA against contracting and appears to be a discussion of what actions the CSR Board, the state regulatory board for court reporters in Louisiana, were taking concerning enforcement of a provision of Louisiana law. There is no evidence of a formal adoption of an anti-contracting stance by the LCRA in this case, and what evidence there is[4], is protected by the *Noerr-Pennington* Immunity Doctrine, as noted in this Court's previous Order and Reasons (Rec. Doc. 137).

Finally, the 2018 meeting minutes attached to Esquire's motion also fail to establish that defendant LCRA had formally adopted an anti-contracting policy. The Minutes state: "Ms. Kazik had a telephone conference on April 3, at 1:00 pm with Marcia Ferranto the CEO of NCRA to discuss NCRA's stance on anti-contracting . . . Legal Counsel cannot link ethics to stop companies from engaging in business practices." Rec. Doc. 145-6. Once again, this fails to rise to the level of showing that the LCRA has formally adopted an anti-contracting policy. What it does show is that there was a discussion between the president of the LCRA, Eve Kazik, and the president of

---

[4] Statements made by LCRA members at CSR Board meetings.

the NCRA, Marcia Ferranto, about "the *NCRA's stance* on anti-contracting." *Id*. (emphasis added). No mention is made in the meeting minutes of the LCRA's collective stance on anti-contracting nor of a vote taken to adopt an anti-contracting stance on the part of the LCRA. *Id*.

New Orleans, Louisiana this 9th Day of December 2019

                                        SENIOR UNITED STATES DISTRICT JUDGE